423 F.3d 166
 In Re SMART WORLD TECHNOLOGIES, LLC, Freewwweb, LLC, and Smart World Communications, Inc., Debtors.
Smart World Technologies, LLC, Freewwweb, LLC, and Smart World Communications, Inc., Debtors-Appellants,
v.
Juno Online Services, Inc., Official Committee of Unsecured Creditors, Worldcom Technologies, Inc., and UUNET Technologies, Inc., Appellees.
 Docket No. 04-3497-BK.
 United States Court of Appeals, Second Circuit.
 Argued March 8, 2005.
 Decided September 12, 2005.
 
 COPYRIGHT MATERIAL OMITTED J. Alex Kress (Dennis J. O'Grady and Glenn D. Curving, of counsel; Stephen J. Amoriello III and Ryan G. Foley, on the brief), Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, for Debtors-Appellants.
 Lawrence P. Gottesman, Bryan Cave LLP, New York, NY, (Rebecca Tapie and Karine Louis, of counsel, Brown Raysman Millstein Felder & Steiner LLP, New York, NY), for Appellee Juno Online Services, Inc.
 Laurence May (Rochelle R. Weisburg, of counsel, and Leonard H. Gerson, on the brief), Angel & Frankel, P.C., New York, NY, for Appellee Official Committee of Unsecured Creditors.
 Thomas R. Califano (Eric B. Miller, of counsel), Piper Rudnick LLP, Baltimore, MD, for Appellees WorldCom Technologies, Inc. and UUNET Technologies, Inc.
 G. Eric Brunstad, Jr., Bingham McCutchen LLP, Hartford, CT, Amicus Curiae urging reversal.
 Before: WALKER, Chief Judge, NEWMAN and JACOBS, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Debtors-appellants Smart World Technologies, LLC, Freewwweb, LLC, and Smart World Communications, Inc. (collectively, "Smart World") appeal from an unreported decision and order of the United States District Court for the Southern District of New York (Denise L. Cote, Judge), Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), No. 03 Civ. 9467, 2004 WL 1118328 (S.D.N.Y. May 19, 2004) ("Smart World"), which affirmed the judgment of the bankruptcy court (Cornelius Blackshear, Bankruptcy Judge). The bankruptcy court granted Smart World's creditors standing to pursue settlement, under Federal Rule of Bankruptcy Procedure 9019, of an adversary proceeding between Smart World and appellee Juno Online Services, Inc. ("Juno"), despite Smart World's strenuous objections.[1] Following a hearing, the bankruptcy court approved the settlement.
 
 
 2
 On appeal, Smart World argues that as debtor-in-possession, it alone was entitled to bring a Rule 9019 motion. Smart World also raises a number of specific challenges to the bankruptcy court's approval of the settlement.[2] Because we find that the bankruptcy court erred in granting WorldCom and the Committee standing, we vacate the judgment of the district court affirming the bankruptcy court's approval of the settlement and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 I. The Sale
 
 
 3
 Smart World began providing free internet service in 1996. As of June 2000, it had approximately 1.7 million registered subscribers, 750,000 of whom actively used its internet services. Smart World, however, was unable to run its business profitably and sought a purchaser for its most valuable asset, its list of subscribers. On June 29, 2000, it entered into an agreement with Juno, a competing internet service provider who was the sole bidder. Under the agreement, terms of which were set forth in a "Term Sheet," Smart World agreed to sell its subscriber list to Juno and to continue referring subscribers to Juno through its distribution network. As part of the transaction, Juno required Smart World to file for bankruptcy and to conduct the sale under § 363 of the Bankruptcy Code.[3] At Juno's request, Smart World filed for bankruptcy on the very day that the Term Sheet was signed.
 
 
 4
 Under the Term Sheet, Juno was not required to pay Smart World for subscribers unless the subscribers were deemed "qualified."[4] Compensation for qualified subscribers was to be paid partly in cash and partly in Juno stock, with the percentage to be paid in stock increasing with the number of qualified subscribers referred.[5]
 
 
 5
 The bankruptcy court approved the sale on July 19, 2000.
 
 
 6
 
 II. The Good-Faith Hearing and the Adversary Proceeding
 
 
 
 7
 Soon after the sale was approved, relations between the parties soured. According to Smart World, Juno circumvented the process established in the agreement for tracking subscribers referred to Juno by causing a "database dump" on the very day the sale was approved. The database dump allegedly prevented Smart World from identifying how many of its subscribers became qualified subscribers, and thus, how much Juno owed Smart World. When Smart World raised these allegations before the bankruptcy court, the court scheduled a hearing for September 6, 2000 on the issue of Juno's good faith in the § 363 sale.
 
 
 8
 Juno's response to the scheduling of the good-faith hearing was twofold. First, Juno refused to respond to Smart World's discovery requests, complaining that they were overly broad and burdensome. When the bankruptcy court ordered Juno to expedite discovery, Juno dumped tens of thousands of documents on Smart World's counsel just days before the hearing.[6] Second, Juno commenced a declaratory action in an adversary proceeding, which subsumed the good-faith allegations raised by Smart World.
 
 
 9
 Specifically, Juno's complaint, filed just days after the bankruptcy court decided to hold the good-faith hearing, addressed the precise issues regarding implementation of the Term Sheet raised by Smart World. Juno denied that it had engaged in a database dump and instead asserted that Smart World had "concoct[ed] false claims relating to the implementation of the Term Sheet . . . in an effort to extract additional and unearned consideration from Juno." According to Juno, it was Smart World, and not Juno, who had impeded implementation of the agreement. In fact, Juno argued, Smart World had not only "failed to fully implement critical elements [of the Term Sheet]," but in addition Smart World's three most senior officers had in effect extorted Juno, "threaten[ing] to immediately resign . . . unless Juno immediately paid [them] salaries in excess of the amounts previously authorized by the Court," a demand to which Juno allegedly felt that it had to yield. In short, Juno maintained, Smart World's accusations of wrongdoing were part of a wholesale "effort to extract additional consideration from Juno . . . and to obtain other modifications to the Term Sheet."
 
 
 III. Delays in the Adversary Proceeding
 
 
 10
 Between August 2000, when Juno commenced the declaratory action, and September 2003, when the bankruptcy court approved settlement, the adversary proceeding stalled, essentially because Juno repeatedly represented to the bankruptcy court that settlement was imminent and because the court openly supported settlement rather than litigation. From the beginning, Smart World's efforts to prosecute its own claims and to engage in discovery were frustrated.
 
 
 11
 In October 2000, Smart World applied to the bankruptcy court for retention of special litigation counsel on a contingency basis. Juno opposed the application and instead asked the court for a "standstill agreement," which would allow settlement negotiations to proceed. The court granted Juno's request, giving the parties until November 8, 2000 to come to an agreement. With the acquiescence of Smart World's creditors, Juno deliberately excluded Smart World from the ensuing negotiations.
 
 
 12
 When the parties failed to settle by November 2000, litigation resumed, and the bankruptcy court approved Smart World's request to retain litigation counsel on a contingency basis. Soon after, Smart World filed its answer and counterclaims[7] and commenced discovery. In the meantime, Juno continued to negotiate settlement with Smart World's creditors, without Smart World's participation. Smart World's lawyers had just begun reviewing documents produced by Juno in January 2001 when, according to Smart World, Juno's lawyers told Smart World that a settlement had been reached and immediately terminated all further discovery.
 
 
 13
 On February 7, 2001, the bankruptcy court held a hearing on the purported settlement at which Smart World's principal creditor, WorldCom, characterized the settlement as a "confidential" agreement between Juno and WorldCom:
 
 
 14
 I think we need to be fair here. World Com [and Juno] started settlement discussions just with themselves in early December. [Counsel for Juno] had previously uniformly taken the position that [Smart World] has no economic stake and he didn't want to include [Smart World] in any settlement negotiations.
 
 WorldCom's lawyer further asserted:
 
 15
 We don't have a fiduciary duty to anyone else and we don't want to have that handle put upon us. . . . [W]e were not motivated by the merits of the claims. We were motivated by what we see as a deteriorating situation both in this case and at Juno, and we felt a settlement that we could get paid upon quickly was better than nothing. That was our motivating factor. We didn't need discovery because of the way we approached it. Other people may need confirmatory discovery, but that was not our approach to this matter.
 
 
 16
 Juno's earlier claim that a settlement had been reached proved to be inaccurate; however, promising the bankruptcy court that settlement was imminent, Juno requested another "standstill of the [adversary] litigation," to allow negotiations to continue and to avoid further discovery by Smart World. When the court indicated its intention to grant a thirty-day stay, Smart World argued that the case could not "settle . . . without discovery," to which the court responded that it would allow "discovery as to the settlement proposal only," but "not [as it pertains to] the adversary [proceeding]." The court also expressed its strong preference for settlement and its deep reluctance to allow the adversary suit to continue.
 
 
 17
 The thirty-day standstill stretched into months. In October 2001, nearly eight months later, with no settlement reached, Smart World moved to recommence prosecution of the adversary proceeding. Juno opposed the motion. The bankruptcy court repeatedly adjourned the motion.
 
 
 18
 Five months later, on March 26, 2002, the bankruptcy court held a hearing at which it summarily denied Smart World's motion to recommence the adversary proceeding. The bankruptcy judge's explanation was that "I have been on the bench about 17 years, [and] I know when we should have a settlement and when we should have a litigation." Relying on the assurances of counsel for Juno and the creditors that a settlement would soon be reached, the bankruptcy court agreed to "one more adjournment" until June 2002. The court stated unequivocally that if no settlement was reached by June, it would "turn [Smart World's counsel] loose" to conduct discovery and litigate the adversary claims.
 
 
 19
 Despite this pronouncement, June came and went, and the standstill continued. In September 2002, nineteen months after the bankruptcy court had first stayed the adversary proceeding, the parties again informed the court that settlement had not been achieved. Nevertheless, the court once more rejected Smart World's efforts to recommence the adversary proceeding. Stating that Smart World "really does not have a pecuniary interest," the bankruptcy court dismissed Smart World's assertion that, if it won the adversary case on the merits, "there would be value for all Creditors." The bankruptcy court also paid scant attention to evidence suggesting that WorldCom might have been pursuing a quick and easy settlement with Juno, under which it would receive the bulk of the settlement payment, for reasons antithetical to interests of the estate.[8] Instead, the bankruptcy court adjourned the case yet again, until October 23, 2002, calling it a date "etched in granite," meaning that if settlement were not reached, the court would definitely allow Smart World to recommence the adversary proceeding.
 
 
 20
 When that date arrived, however, and the parties still had not settled, the bankruptcy court lost its strong resolve. Instead, the bankruptcy court ordered mediation, which proved unsuccessful.
 
 
 IV. The Rule 9019 Motion
 
 
 21
 In May 2003, almost three years after Juno had commenced its adversary suit, and over two years after proceedings, including any meaningful discovery, had been stayed, Juno and Smart World's creditors filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 to settle the adversary proceeding between Juno and Smart World. Under the terms of the settlement, Smart World's claims would be settled and released in exchange for Juno's payment of $5.5 million to WorldCom.[9] It also called for broad releases and injunctive relief from any claim arising out of the adversary proceeding, Smart World's bankruptcy, and Juno's ancillary dispute with WorldCom.
 
 
 22
 Smart World objected to the settlement. Smart World contended, inter alia, (1) that the settlement was not reasonable because it did not require Juno to pay even its admitted liability to Smart World; (2) that the settlement improperly recognized a substantial secured claim in favor of WorldCom, though "the liens securing the WorldCom claim are highly suspect and its claim is overstated"; (3) that the settlement was premature because Smart World — absent meaningful discovery — had not been able adequately to evaluate the likely success of its claims against Juno; and (4) that the court should not approve a settlement of Smart World's claims by the creditors because Smart World was actively pursuing them. Finally, and most pertinent on appeal, Smart World challenged appellees' "standing to pursue settlement over debtors' objection."
 
 
 23
 The bankruptcy court conducted a Rule 9019 hearing on August 19, 2003, at which, in substance, it dismissed all of Smart World's objections. The bankruptcy court was openly hostile to Smart World's claim that it had not been able to conduct meaningful discovery because of the repeated stays imposed by the bankruptcy court and thus could not properly evaluate the proposed settlement, at one point even threatening to cite counsel for contempt if he referred again to the lack of discovery.
 
 
 24
 When Smart World attempted to argue the merits of its claims against Juno — for example, by trying to demonstrate the number of qualified subscribers Juno had obtained from Smart World and the ways in which Juno had breached the Term Sheet — the court again displayed its hostility to Smart World's position by refusing to hear Smart World. At one point, the court explicitly disallowed any argument as to the merits of Smart World's claims:
 
 
 25
 [COUNSEL FOR SMART WORLD]: Our position is to evaluate the merits of the claim —
 
 
 26
 THE COURT: You know what? That is what I warned your . . . colleague about. I don't need for you all to do that. Right now we're looking at the reasonableness of the settlement.
 
 
 27
 Having concluded that any discussion, and presumably meaningful evaluation, of the merits of Smart World's claims were unnecessary, the bankruptcy court announced its intention to approve the settlement. The bankruptcy court stated that it would allow Smart World to pursue its claims only upon a condition Smart World was unable to meet: the posting of a supersedeas bond securing the amount of the settlement for the estate.
 
 
 V. Rulings Below
 
 
 28
 In September 2003, the bankruptcy court approved the Rule 9019 settlement. It found that the "Debtors' estates are insolvent," that Smart World's refusal to join in the settlement was "unreasonable in view of the risks, expense and delay that would be posed by further litigation of the Action, as well as in view of the insolvency of the Debtors' estates," that "[c]ontinuation of the Action would amount to equity gambling with the recovery that would otherwise go to the creditors," and that the settlement was in the "best interests of the Debtors, their estates and their creditors and equity holders." As to the creditors' standing to pursue the settlement over Smart World's objection, the bankruptcy court found a legal basis in various provisions of the Bankruptcy Code giving creditors the right to intervene and endowing the bankruptcy court with equitable powers.
 
 
 29
 The district court affirmed. While recognizing that the creditors' standing to pursue a Rule 9019 settlement over the objections of the debtor-in-possession raised an issue of first impression, the district court found that under 11 U.S.C. § 105(a) and this court's derivative standing doctrine, the bankruptcy court was within its equitable powers in allowing WorldCom and the Committee to settle Smart World's claims over Smart World's objection. Smart World, 2004 WL 1118328, at *3. It characterized Smart World's position as "an unrealistic hope that continued litigation would be so wildly successful that it might yield some recovery for its equity holders." Id. It further held that the terms of the settlement at $5.5 million were "reasonable," noting that if Smart World lost the adversary proceeding, Juno would not have to pay anything, whereas if Smart World won, the proceeds might be as little as $4 million. Id. at *2.
 
 
 30
 This appeal followed.
 
 DISCUSSION
 
 31
 The primary issue before us raises a question of first impression, as both lower courts recognized. Did the bankruptcy court err in granting Smart World's creditors standing to settle the adversary proceeding between Smart World and Juno, without Smart World's participation and over Smart World's objections? We have jurisdiction to decide this question under 28 U.S.C. §§ 158(d) and 1291, and we exercise plenary review of the bankruptcy court's decision, considering legal issues de novo, and reviewing factual findings for clear error. Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir.1997). We conclude that while authority to pursue a Rule 9019 motion may, in certain limited circumstances, be vested in parties to the bankruptcy proceeding other than the debtor-in-possession, those circumstances are not present here. Accordingly, we vacate and remand for further proceedings.
 
 
 32
 
 I. Rule 9019 and the Role of the Debtor-in-Possession
 
 
 
 33
 We begin with the language of Rule 9019, which authorizes only the trustee, or debtor-in-possession,[10] to bring a motion for settlement: "On motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). The rule provides for notice to other interested parties, including creditors, id., but as one court has noted, "the right to notice normally accorded all `parties in interest' . . . does not entail party status in the adversary proceeding to be settled." Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1140 n. 5 (1st Cir.1992) (emphasis added); see also In re Masters, Inc., 141 B.R. 13, 16 (Bankr.E.D.N.Y.1992) (same).
 
 
 34
 That the Rule vests authority to settle or compromise solely in the debtor-in-possession is hardly surprising in light of the numerous provisions in the Bankruptcy Code establishing the debtor's authority to manage the estate and its legal claims. For instance, when a chapter 11 case is filed, an automatic stay applies that enjoins all entities from, inter alia, engaging in "any act[s] . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); see also 3 Collier ¶ 362.03[5] (explaining purpose of § 362(a)(3)). This provision allows the debtor-in-possession to take control of the estate's property in order to "assure an equitable distribution of the property among creditors," id., and it evinces Congress's desire to leave administration of the chapter 11 estate solely in the hands of the debtor-in-possession.
 
 
 35
 Rule 9019 is also consistent with the debtor-in-possession's role as legal representative of the bankruptcy estate, set forth in 11 U.S.C. § 323(a).[11] As legal representative, the debtor-in-possession has the power to sue and be sued on the estate's behalf, id. § 323(b); see also 7 Collier ¶ 1107.02[3][a], which presumably includes the derivative power to settle suits. In other words, § 323 implies what Rule 9019 expressly states — i.e., that it is the debtor-in-possession, as legal representative of the estate, who is vested with the power to settle the estate's claims.
 
 
 36
 Indeed, the Code not only authorizes the chapter 11 debtor to manage the estate's legal claims, but in fact requires the debtor to do so in a way that maximizes the estate's value. Under the Code, the debtor-in-possession is held "accountable for all property [of the estate] received." 11 U.S.C. § 1106(a)(1) (incorporating § 704(2)). Property of the estate for which the debtor is held accountable includes, inter alia, "all legal or equitable interests of the debtor . . . as of the commencement of the case," id. § 541(a)(1), such as valuable causes of action, see United States v. Whiting Pools, Inc., 462 U.S. 198, 205 & n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), as well as "[p]roceeds, product, offspring, rents, or profits of or from property of the estate," 11 U.S.C. § 541(a)(6). Courts therefore have interpreted § 1106(a)(1) to include "the duty to appear and prosecute, or defend against, any cause of action on behalf of the estate" that may benefit or adversely affect the property of the debtor's estate. 7 Collier ¶ 1107.02[1][a]; see also Gramil Weaving Corp. v. Raindeer Fabrics, Inc., 185 F.2d 537, 540 (2d Cir.1950) (directing debtor-in-possession to defend against claims against the estate). In making the debtor-in-possession accountable for the estate's legal claims, Congress vested the debtor with the responsibility to determine how best to handle those claims.
 
 
 37
 Similarly, the debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only fiduciary.[12] See Wolf v. Weinstein, 372 U.S. 633, 649-50, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) (observing that debtor-in-possession has fiduciary duty to the estate). As fiduciary, the debtor bears the burden of "maximiz[ing] the value of the estate," Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), including the value of any legal claims. Courts have thus concluded that in some instances, fiduciary duty requires the chapter 11 debtor to pursue a cause of action, see Louisiana World Exposition v. Fed. Ins. Co., 858 F.2d 233, 246 (5th Cir.1988), but in other instances may require settlement, see In re Energy Coop., Inc., 886 F.2d 921, 927 (7th Cir.1989).
 
 
 38
 In short, Rule 9019, which by its terms permits only the debtor-in-possession to move for settlement, is in complete harmony with the provisions of the Bankruptcy Code delineating the chapter 11 debtor's role. It is the debtor-in-possession who controls the estate's property, including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate.
 
 
 39
 Despite the plain language of Rule 9019 and the clear policy of the Code, appellees nevertheless maintain that Rule 9019 need not be strictly followed. We agree with appellees that under certain circumstances, settlement of an estate's claim could be approved over the objections of a debtor-in-possession. For example, the Code provides that aggrieved creditors and other parties dissatisfied with a debtor-in-possession's conduct may seek appointment of a trustee or examiner under the Code, see 29 U.S.C. § 1104, who could then presumably bring a Rule 9019 motion. As Smart World points out, however, the standard for § 1104 appointment is very high, requiring the party seeking appointment to show either (1) cause, "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor," or (2) that appointment is "in the interests of creditors, any equity security holders, and other interests of the estate." Id. § 1104(a)(1), (2); see also 7 Collier ¶ 1104.02[2][a] (describing occasions for appointment of a trustee as "extraordinary cases"). In any event, appellees have not sought appointment of a trustee or examiner, nor did they do so below, but instead seek to ground their standing in principles of derivative standing and various Code provisions. As we explain below, we reject appellees' arguments for various reasons, though we do not foreclose altogether the possibility of creditor standing in the Rule 9019 context.
 
 
 II. Derivative Standing
 
 
 40
 Appellees argue that their standing to bring a Rule 9019 motion was supported by the doctrine of derivative standing, which was first recognized by this court in Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901 (2d Cir.1985) ("STN"). In that case, we held that although "no explicit authority for creditors' committees to initiate adversary proceedings" exists in the Bankruptcy Code, creditors have an implied, qualified right to bring suit on behalf of the estate under 11 U.S.C. §§ 1103(c)(5)[13] and 1109(b).[14] Id. at 904. We found that derivative standing "to initiate suit with the approval of the bankruptcy court" exists when the "debtor in possession [has] unjustifiably failed to bring suit." Id. STN thus makes clear that derivative standing in the bankruptcy context is analogous to derivative standing in shareholder suits; it arises when the debtor unjustifiably refuses to pursue a cause of action.[15] See also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 579 (3d Cir.2003) (en banc) ("Cybergenics") (finding derivative standing appropriate where a "debtor unreasonably refuses to pursue" a fraudulent transfer action); Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.), 66 F.3d 1436, 1438 (6th Cir.1995) ("Gibson Group") (requiring, inter alia, that the debtor-in-possession have unjustifiably refused a demand to sue); Louisiana World Exposition, 858 F.2d at 247 (same); In re Xonics Photochemical, Inc., 841 F.2d 198, 203 (7th Cir.1988) (suggesting derivative standing is appropriate only where "debtor was shirking his statutory responsibilities"); cf. Ross v. Bernhard, 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (noting requirement in derivative shareholder suits that the corporation "refused to proceed after suitable demand").
 
 
 41
 Until now, derivative standing has been sought only in cases where the debtor refuses to sue; here, we are faced with the converse situation. It is the debtor-in-possession who wishes to pursue the estate's legal claims, and the creditors who seek to prevent the debtor from doing so. Appellees' position is, presumably, that derivative standing is appropriate in the Rule 9019 context where the debtor unjustifiably refuses to settle a claim, or unjustifiably insists on pursuing a claim. We do not rule out that in certain, rare cases, unjustifiable behavior by the debtor-in-possession may warrant a settlement over the debtor's objection, but this is not such a case.
 
 
 42
 As an initial matter, we note that derivative standing in the Rule 9019 context is not merely the mirror image of a typical derivative standing case, but is conceptually distinguishable. In our view, there is an important difference between pursuing an otherwise neglected claim and settling a claim that the estate is trying to pursue. The former usually involves a claim against the debtor's principals themselves, who refuse to litigate out of self interest. See, e.g., Cybergenics, 330 F.3d at 573; STN, 779 F.2d at 902. Derivative standing in such a case may be necessary to avoid the inherent conflict of interest that exists when those with the power to pursue a claim are those who may be the target of such a claim. In the Rule 9019 context, by contrast, it is the debtor and its principals who seek to pursue a claim on behalf of the estate, which is precisely the role of the debtor-in-possession envisioned by the Code. In such circumstances, we think it less likely that the debtor's principals will be motivated by reasons that conflict with the best interests of the estate. On the contrary, it is more likely that allowing creditors and other parties to bring Rule 9019 motions over a debtor's objection will encourage parties against whom the estate has a valid claim to delay and obstruct litigation, in the hopes that a creditor with a small interest in the estate will eventually propose a settlement disposing of the estate's valuable causes of action at a low price. The possibility of such perverse dynamics suggests that derivative standing will be appropriate much less frequently in the Rule 9019 context than in the usual case (i.e., where the would-be derivative plaintiff wishes to pursue a claim). We thus emphasize that a debtor-in-possession pursuing litigation is much less likely to be acting for reasons antithetical to the interests of the estate than a debtor-in-possession who refuses to sue its own principals; accordingly, a party who seeks to displace the debtor faces a heavier burden in the former case than in the latter.
 
 
 43
 That burden plainly was not satisfied here. Indeed, appellees' showing was insufficient even under the usual standard for derivative standing. As we stated in STN, in a typical derivative standing case, "[t]he court's inquiries will involve in the first instance . . . a determination of probabilities of legal success and financial recovery in event of success." 779 F.2d at 905. While we noted that "the court need [not] undertake a mini-trial," we nevertheless emphasized that the court "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." Id. at 906.[16] Although both appellees and the lower courts were quick to characterize Smart World's position as unjustifiable,[17] we find that no such inquiry into the "likelihood of success" of settlement versus litigation took place here.
 
 
 44
 Indeed, having searched the record in vain for anything more than a conclusory statement from the bankruptcy court as to the merits of Smart World's claims against Juno, we find it difficult to understand how the lower courts could have formed such a firm opinion that Smart World's claims lacked viability. At the Rule 9019 hearing, for instance, Smart World's counsel stated "[w]e think Your Honor needs to make a record here, and make findings as to the range of reasonableness as to the settlement."[18] Counsel further offered to provide testimony as to "the factual circumstances underlying the various claims" and a "calculation based on [the witness's] knowledge of the potential value of the claims." The bankruptcy court brushed the offer aside, stating "[t]here's no need for him to do that." Even WorldCom's counsel pointed out to the bankruptcy court that it had not heard Smart World's explanation of its "theory of recoveries, claims and damages," a fact that the court found untroubling. Indeed, at one point in the hearing, the court actually refused to listen to any argument on the merits:
 
 
 45
 [COUNSEL FOR SMART WORLD]: Our position is to evaluate the merits of the claim —
 
 
 46
 THE COURT: You know what? That is what I warned your . . . colleague about. I don't need for you all to do that. Right now we're looking at the reasonableness of the settlement.
 
 
 47
 The bankruptcy court's written decision similarly fails to seriously evaluate the merits of Smart World's claims. Nowhere in its decision does the bankruptcy court discuss Smart World's contentions (1) that Juno had prevented Smart World from identifying subscribers referred to Juno by Smart World, (2) that Juno had deliberately tried to get out of the sale transaction because it had received a better offer, and (3) that, based on Juno's concessions alone, Smart World was entitled to a minimum of $5 million.[19] The bankruptcy court's assessment of Smart World's position is instead confined to a few sentences, stating cursorily (1) that Smart World's position was "unreasonable in view of the risks, expense and delay [of] further litigation," (2) that litigation "would amount to equity gambling with the recovery that would otherwise go to the creditors of the Debtors' estates," and would "result in substantial delay and pose[ ] a material risk [of] substantially [reduced recovery]." Such bald and unsupported assertions, with no explanation of why the debtor's position is unjustifiable or unlikely to succeed, could not have sustained a grant of derivative standing under STN, nor can they in the Rule 9019 context, which, as discussed above, imposes a heavier burden.
 
 
 48
 Other aspects of the proceedings below further persuade us that derivative standing was not appropriate. First, the bankruptcy judge from the beginning repeatedly and frankly expressed his strong preference for settlement over litigation, suggesting that his evaluation of Smart World's claims may have been colored by his own desire to "get this matter out of [his] hair" and to "eliminate the litigation."
 
 
 49
 Second, the repeated stays and adjournments imposed by the court prevented Smart World from conducting any meaningful discovery. As detailed in the history recited above, discovery was stayed in October 2000, briefly recommenced in December 2000, terminated by Juno's lawyers in January 2001, and thereafter never resumed. The bankruptcy court was apparently under the impression that settlement was possible without discovery, but as Smart World's lawyers tried to point out at the first settlement hearing in February 2001, the case could not easily "settle . . . without discovery." In the absence of a more fully developed record, we fail to see how the bankruptcy court, let alone Smart World, could have weighed the proposed settlement against the potential value of its claims.
 
 
 50
 Third, and of more serious consequence, the bankruptcy court seems to have ignored several signs that the interests of the settling parties were in conflict with those of the estate, thereby rendering creditor derivative standing inappropriate. Juno's interests plainly conflicted with those of the estate, since it presumably wanted to pay out as little as possible in settlement. WorldCom, the other main proponent of settlement, likewise had considerable incentive to swiftly end the bankruptcy proceedings. The challenge by other creditors to WorldCom's status as the only secured creditor was cause for it to want to quickly settle and thereby avoid having its share diluted by a full and possibly adverse determination of priority.[20] WorldCom's counsel candidly admitted that WorldCom did not view the settlement as a fiduciary, that it was primarily concerned with getting money from Juno quickly,[21] and that it had not evaluated the merits of Smart World's claims against Juno. It is also undisputed that Smart World was excluded from certain settlement negotiations between Juno and Smart World's creditors, who at one point referred to the settlement as a "confidential agreement." In short, this case is a poster child for why the Code and Rule 9019 authorize only the debtor-in-possession to pursue or settle the estate's legal claims, and why the derivative-standing exception to that policy is narrow: As a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative.
 
 
 51
 Finally, we think it significant that Smart World's counsel was retained on a contingency basis. In derivative standing cases, courts often view favorably the willingness of the party seeking derivative standing to absorb the costs of litigation, since such willingness not only demonstrates a belief in the merits of the claim, but also spares the bankruptcy estate from absorbing any further costs. See STN, 779 F.2d at 906 (noting that under contingent fee arrangement, pursuit of litigation would not "impose a net burden on the bankruptcy estate"); see also Louisiana World Exposition, 858 F.2d at 248 n. 15 (noting that contingent fee arrangement indicated "a limited cost factor"); cf. In re Housecraft, 310 F.3d at 71 (observing that estate "incurred no risk of loss" by consenting to derivative standing of creditor because creditor agreed to "pay for all litigation expenses, regardless of whether the lawsuit was successful"). Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award. Where a debtor-in-possession seeks to litigate and its counsel has been retained on a contingency basis, it will be even more difficult for a party seeking derivative standing to demonstrate that the estate would be better off settling the claim.
 
 
 52
 Our decision today does not foreclose the possibility that in rare circumstances derivative standing might be appropriate in the Rule 9019 context. But we think that such circumstances will be rare, and we find that none are present in this case. Accordingly, we reject appellees' claim that the doctrine of derivative standing entitled WorldCom and the Committee to settle Smart World's claims against Juno.
 
 
 III. Section 1109(b)
 
 
 53
 Appellees also maintain that Smart World's creditors have standing to bring a Rule 9019 motion under 11 U.S.C. § 1109(b).[22] They argue that under this court's decision in Term Loan Holder Committee v. Ozer Group, LLC (In re Caldor Corp.), 303 F.3d 161 (2d Cir.2002) ("Caldor"), the creditors had an unconditional right to intervene in the adversary proceeding between Smart World and Juno. The right to intervene, they maintain, "clearly encompasses an intervening party's right to propose a settlement of the dispute in which it has intervened." Citing the Rules Enabling Act[23] and the Supreme Court's decision in Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004),[24] appellees further contend that to the extent Rule 9019 limits standing to the debtor-in-possession, it conflicts with § 1109(b), and therefore must give way. We disagree.
 
 
 54
 Where a conflict between a Rule and a statutory provision exists, of course, the Rules Enabling Act requires that we apply the statutory provision. But unfortunately for appellees, no such conflict exists between § 1109(b) and Rule 9019. Section 1109(b) on its face permits only intervention; properly construed, it does not authorize creditors to pursue settlement under Rule 9019, which makes that remedy available only to the debtor-in-possession.
 
 
 55
 The text of § 1109(b) states that a "party in interest, including. . . a creditors' committee . . . [or] a creditor . . . may raise[,] and may appear and be heard on[,] any issue in a case under this chapter." 11 U.S.C. § 1109(b). In Caldor, this court held that § 1109(b) provides parties in interest with "an unconditional right to intervene" in adversary proceedings under chapter 11,[25] pursuant to Fed.R.Civ.P. 24(a)(1).[26] Caldor, 303 F.3d at 176. This case requires us to decide whether the creditors' § 1109(b) "right to intervene" in the Juno-Smart World adversary proceeding includes the right to settle that proceeding over Smart World's objection. See Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.), 285 B.R. 848, 850 (Bankr.S.D.N.Y.2002) (noting that after Caldor, it remains unclear "what are [the] rights [of parties in interest] as intervenors"); see also Iridium India Telecom Ltd. v. Motorola, Inc. (In re Iridium Operating, LLC), No. 04 Civ. 8687, 2005 WL 696792, at *2 (S.D.N.Y. Mar.23, 2005) (suggesting that "the scope of the unconditional intervention right of a party in interest as enunciated by the Second Circuit in Caldor" remains unclear). We conclude that § 1109(b) does not extend that far.
 
 
 56
 First and foremost, the Supreme Court in Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) ("Hartford Underwriters"), construed § 1109(b) narrowly. That case concerned 11 U.S.C. § 506(c), which provides "an important exception to the rule that secured claims are superior to administrative claims." Id. at 5, 120 S.Ct. 1942. Section 506(c), like Rule 9019, however, allows only the "trustee," or debtor-in-possession, to take advantage of this exception. Id. at 6, 120 S.Ct. 1942. In holding that an administrative claimant was not entitled to recover property under § 506(c), the Supreme Court specifically held that § 1109(b) could not overrule the express language of § 506(c): "[W]e do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." Id. at 8, 120 S.Ct. 1942; see also id. at 8-9, 120 S.Ct. 1942 (noting that § 1109 "`does not bestow any right to usurp the trustee's role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate'" (quoting 7 Collier ¶ 1109.05)). We read Hartford Underwriters to stand for the proposition that § 1109(b) does not entitle parties in interest, such as Smart World's creditors, to usurp the debtor-in-possession's role as legal representative of the estate. See also Cybergenics, 330 F.3d at 561-62 (noting Court's concern in Hartford Underwriters with the debtor-in-possession's ability to "act as a gatekeeper, weighing the potential benefits of litigation against the costs it might incur").
 
 
 57
 Our view of § 1109(b) is also consistent with circuit court decisions that have discussed § 1109(b) intervention. In Official Unsecured Creditors' Committee v. Michaels (In re Marin Motor Oil, Inc.), 689 F.2d 445, 454-55 (3d Cir.1982), the Third Circuit recognized that § 1109(b) afforded an unconditional right to intervene in adversary proceedings, and gave intervenors broader participation rights than those generally granted amici. However, that court also expressly distinguished between "an absolute right to intervene in adversary proceedings already initiated by a . . . debtor in possession" and "[the right to bring] new causes of action in favor of creditors and committees," and limited its holding to the former, without reaching the latter. Id. at 456 & n. 11 (internal quotation marks omitted).
 
 
 58
 Similarly, a distinction can be drawn between the right to intervene in an adversary proceeding, to which appellees are plainly entitled, and the right to take ownership of the debtor's claims in that adversary proceeding. The former does not equate to the latter. Intervenors' claims are generally understood to be separate from those of the original parties to a proceeding. Cf. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 528-29, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (noting, in context of consent decree, that "[i]t has never been supposed that one party — whether an original party, a party that was joined later, or an intervenor — could preclude other parties from settling their own disputes and thereby withdrawing from litigation" (emphasis added)).
 
 
 59
 Two lower courts within this circuit have addressed precisely the question faced here: whether the unconditional § 1109(b) right to intervene we announced in Caldor includes the right to take ownership of the debtor's legal claims. Both courts have answered the question in the negative. In Official Committee of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 287 B.R. 861, 862 (S.D.N.Y.2003), the court distinguished between the "creditor's right to intervene" and "the right, in essence, to take ownership of the [estate's] causes of action," and held that the former did not include the latter. Id. Similarly, in In re Adelphia Communications Corp., the bankruptcy court granted the creditors' committees' motion to intervene, but "took under advisement exactly what the Committees' rights as a consequence of [Caldor] would be." 285 B.R. at 850. After observing that Caldor had not overruled STN, the court ultimately concluded that § 1109(b) entitled the creditors to "standing to raise issues and to appear and be heard," but that the right did "not equate to ownership of the causes of action in question." Id. at 851. In order to "secure the latter," the court noted that the creditors would have to meet the standard for derivative standing under STN. Id.
 
 
 60
 We agree with the reasoning of Adelphia and Sunbeam. If § 1109(b) were construed as giving creditors the unilateral right to take control of the estate's legal causes, it would conflict not only with the plain text of Rule 9019, but also with those provisions of the Bankruptcy Code assigning the debtor-in-possession the duty to act as the estate's legal representative, see 11 U.S.C. §§ 323, 1107, and holding the debtor-in-possession accountable for the estate's property, including its valuable legal claims, see 11 U.S.C. § 1106(a)(1). Reading the Code as a whole, we decline to construe § 1109(b) in a manner that would place it in conflict with other provisions. See Cybergenics, 330 F.3d at 560 (discussing the importance of construing Bankruptcy Code as a whole); see also Auburn Hous. Auth. v. Martinez, 277 F.3d 138 (2d Cir.2002) ("Statutory construction is a holistic endeavor. . . . [T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (internal citations and quotation marks omitted)). In creating the § 1109(b) right "to appear and to be heard on any issue," Congress cannot have intended to override the Code provisions in which it carved out an exclusive role for the debtor-in-possession as legal representative and fiduciary of the estate. Were we to hold otherwise, we would be reading § 1109(b) as an open-ended license to creditors to take over the estate's litigation, far exceeding the role envisioned for them by Congress.
 
 
 61
 Contrary to appellees' contention, the Rules Enabling Act does not require us to ignore Rule 9019 in favor of § 1109(b). The Rule and the Code provision can easily be harmoniously construed: Rule 9019 grants the debtor-in-possession the sole authority to bring a motion to settle or compromise, and § 1109(b), properly read, does not purport to extend that power to other parties.
 
 
 IV. Section 105
 
 
 62
 Finally, we turn to 11 U.S.C. § 105, on which both the bankruptcy court and the district court, Smart World, 2004 WL 1118328, at *2, relied in granting appellees standing.[27] Section 105 grants the bankruptcy court equitable powers to implement the provisions of the Bankruptcy Code:
 
 
 63
 The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
 
 
 64
 11 U.S.C. § 105(a). Relying on this grant of equitable power to the bankruptcy court, the district court found that approval of the settlement was warranted, "even without any motion from or the consent of the debtor-in-possession." Smart World, 2004 WL 1118328, at *3.
 
 
 65
 While there is some disagreement among the circuit courts as to how broadly to construe the bankruptcy court's § 105(a) power to "fill the gaps left by the statutory language," § 105(a)'s equitable scope is plainly limited by the provisions of the Code. 2 Collier ¶ 105.01[2]; see also id. (noting that even proponents of broader view of bankruptcy court's § 105(a) power must recognize that it "should not be employed as a panacea for all ills confronted"). We recently made the same point:
 
 
 66
 This Court has long recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code. It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.
 
 
 67
 The statutory language supports this limit on the equitable powers of the bankruptcy court. The equitable power conferred. . . by section 105(a) is the power to exercise equity in carrying out the provisions of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing. This language suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.
 
 
 68
 New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.), 351 F.3d 86, 91-92 (2d Cir.2003) (internal quotation marks and citations omitted); see id. at 92 (finding § 105(a) inapplicable where no provision of the Bankruptcy Code could be invoked to support appellant's claim for relief); see also Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206-07, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").
 
 
 69
 In light of our holding in Dairy Mart and the Supreme Court's pronouncement in Ahlers, we hold that the bankruptcy court's power to act pursuant to § 105(a) does not provide an independent basis upon which to grant appellees standing. Section 1109(b), as we have explained, does not entitle appellees to take over Smart World's legal claims, and various other provisions of the Code assign to Smart World alone the role of legal representative of, and fiduciary to, the bankruptcy estate. These are statutory limitations that the bankruptcy court cannot overstep simply by invoking § 105(a).
 
 
 70
 In sum, we conclude that the bankruptcy court erred in granting standing to Smart World's creditors to settle Smart World's claims against Juno over Smart World's objections. Accordingly, we vacate the decision of the district court affirming the bankruptcy court's approval of the settlement and remand for further proceedings. Smart World's remaining objections to the settlement proceedings before the bankruptcy court are therefore moot.
 
 CONCLUSION
 
 71
 For the foregoing reasons, the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 There are two groups of creditors: The Official Committee of Unsecured Creditors of Smart World Technologies, LLC ("the Committee"), and MCI WorldCom Network Services, Inc. and UUNET Technologies, Inc. (collectively, "WorldCom"), an alleged secured creditor. Juno, WorldCom, and the Committee are all appellees
 
 
 [2]
 Smart World (1) challenges the bankruptcy court's discovery and evidentiary rulings as an abuse of discretion; (2) asserts that the bankruptcy court's review of the settlement was inadequate; and (3) objects to the bankruptcy court's approval of the settlement as circumventing the procedural protections provided in 11 U.S.C. §§ 501-03, 1125, and 1129
 
 
 [3]
 Section 363 permits sales of assets free and clear of claims and interestsSee 11 U.S.C. § 363(f). It thus allows purchasers, like Juno, to acquire assets without any accompanying liabilities.
 
 
 [4]
 To qualify, subscribers had to use Juno's service for a certain number of minutes in the applicable month and to have been a user for a certain number of days
 
 
 [5]
 Juno's stock has apparently increased drastically since 2000 due to its merger in September 2001 with Net Zero. Smart World contends not only that it is entitled to payment for referring qualified subscribers, but also, and more importantly, that under the Term Sheet, Juno is required to pay in stock. Specifically, Smart World asserts that the increase in Juno's stock price translates into a 490% increase in the value of Smart World's claims against Juno. Unsurprisingly, Juno disagrees
 
 
 [6]
 Five days before the hearing, Juno advised Smart World that it had approximately 188,000 documents available for review. One day before the scheduled hearing, Juno sent Smart World's counsel a CD-Rom containing 88,000 documents. These documents were, according to Smart World, "useless and nonsensical and. . . not responsive."
 
 
 [7]
 Smart World alleged (1) that Juno had agreed to pay the three officers' salaries at the time of sale, but then refused to do so; (2) that Juno had filed its declaratory action in an effort to get out of the sale because it had received an offer from a party purportedly offering to refer Smart World subscribers to Juno for free; and (3) that Juno had, in fact, received a large number of Smart World subscribers without compensating Smart World according to the terms of the agreement. Smart World sought declaratory judgment and sued for damages for breach of contract and fiduciary duty, tortious inference with business relations, and unjust enrichment
 
 
 [8]
 Specifically, the court ignored the Committee's allegations that WorldCom's liens might be subject to avoidance. If those allegations were true, then WorldCom, which was due to receive the bulk of the settlement amount, might have had to accept a lesser share. The Committee's claims thus indicated that WorldCom had considerable incentive, unrelated to the merits of Smart World's claims, to avoid litigation over its own priority status
 
 
 [9]
 The funds would be used (1) to resolve an ancillary dispute between WorldCom and Juno, (2) to pay WorldCom's alleged secured claim, and (3) to pay various other expenses and claims, including $1.8 million to the Committee
 
 
 [10]
 In a chapter 11 case, such as this one, a trustee is not normally appointedSee 7 Collier on Bankruptcy ¶ 1107.01 (15th ed. rev.1996) ("Collier") (noting that debtors-in-possession are the norm in a chapter 11 case); see also 11 U.S.C. § 1104 (providing for appointment of trustee in chapter 11 proceeding only in certain circumstances). Instead, the debtor usually remains in control of the estate as the "debtor in possession." See id. § 1101. To that end, Congress has vested debtors-in-possession, such as Smart World, with the rights, powers, and duties of a trustee. See id. § 1107. We use the term debtor-in-possession throughout to refer to the party in control of the bankruptcy estate, although the Bankruptcy Rules and Code provisions to which we refer may discuss only the rights and powers of the trustee. See also 7 Collier ¶ 1107.02[1] (§ 1107 must be read in conjunction with other Code sections specifying rights and duties of trustees).
 
 
 [11]
 "The [debtor-in-possession] in a case under this title is the representative of the estate." 11 U.S.C. § 323(a)
 
 
 [12]
 A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estateSee 7 Collier ¶ 1103.05[2] & n. 20.
 
 
 [13]
 Creditors' committees appointed under 11 U.S.C. § 1102 may "perform such . . . services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5)
 
 
 [14]
 "A party in interest, including . . . a creditors' committee [or] a creditor . . . may raise and may appear and be heard on any issue in a case under [chapter 11]." 11 U.S.C. § 1109(b)
 
 
 [15]
 We have also recognized that derivative standing may be appropriate where the debtor-in-possession consentsSee Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.), 262 F.3d 96, 100 (2d Cir.2001) ("Commodore"); Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 70 (2d Cir.2002). The Commodore exception, however, is inapplicable here, as Smart World obviously does not consent to appellees' standing.
 
 
 [16]
 Indeed, in the Sixth Circuit, the bankruptcy court must undertake a "cost-benefit analysis" to determine whether the claim raised by the creditor seeking standing is likely to benefit the estate and, therefore, whether the debtor's refusal to sue is unjustifiedGibson Group, 66 F.3d at 1438.
 
 
 [17]
 Appellees have variously called Smart World's legal claims "fanciful," "perilously uncertain," and "highly speculative," while the bankruptcy court referred to Smart World's desire to continue litigation as "equity gambling."See also Smart World, 2004 WL 1118328, at *3 (calling Smart World's position "an unrealistic hope that continued litigation would be . . . wildly successful").
 
 
 [18]
 Counsel was referring to the reasonableness review that a bankruptcy court must conduct before approving a Rule 9019 settlementSee, e.g., In Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir.2002). Because a review of the settlement's reasonableness requires the court to consider the merits of the underlying claims, see id., the bankruptcy court's failure to adequately review the settlement's reasonableness is relevant to whether it adequately investigated the "likelihood of success" of litigation versus settlement for derivative standing purposes.
 
 
 [19]
 We decline to resolve the dispute between the parties as to whether Smart World would, in the event of a victory on the merits, be entitled to the increase in Juno's stock price. We are unable, on the record before us, to determine whether, if Juno did breach the Term Sheet, it would be barred from electing to pay in cash, as Smart World claims. If Smart World were entitled to the increase in stock price, the potential value of its claims (and the range of reasonableness for any proposed settlement) would change significantly. The dispute over Smart World's entitlement to the current Juno stock price is thus a question properly considered by the bankruptcy court in the first instance when it evaluates the merits of Smart World's claims and, specifically, Smart World's likelihood of substantial recovery
 
 
 [20]
 Indeed, the dispute between WorldCom and the unsecured creditor who filed an objection to WorldCom's priority remained outstanding at the time of the settlement and was, by stipulation, to be resolved after the court granted its approval
 
 
 [21]
 Juno and WorldCom were parties to service contracts unrelated to the Smart World bankruptcy litigation. The settlement was in part Juno's payment on those other obligations
 
 
 [22]
 The bankruptcy court relied in part on § 1109(b) in holding that appellees had standing to bring a Rule 9019 motion, but the district court did not
 
 
 [23]
 "[R]ules [established by the Supreme Court, such as the Rules governing practice and procedure under title 11,] shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075
 
 
 [24]
 In that case, the Supreme Court held that where adhering to Bankruptcy Rule 7001(6), which requires service of a summons, would have precluded the debtor's statutory right to an undue hardship determination, the Rule's requirement could not be given "dispositive weight," for to do so would abridge a statutory right, thereby giving the Rule "impermissible effect."See Tenn. Student Assistance Corp., 541 U.S. at 454, 124 S.Ct. 1905 (citing 28 U.S.C. § 2075).
 
 
 [25]
 Not all courts have taken this positionSee Fuel Oil Supply & Terminaling v. Gulf Oil Corp., 762 F.2d 1283, 1286-87 (5th Cir.1985); see also Caldor, 303 F.3d at 167 (discussing contrary cases); Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1232 (3d Cir.1994) (same); 6 Moore's Fed. Prac. § 24.12[2][a] (3d ed.2005) (noting that § 1109(b) provides for permissive intervention, and that Rule 2018(a), which implements § 1109, is captioned "Permissive Intervention"). But see 7 Collier ¶ 1109.04[2][c] (arguing that under 28 U.S.C. § 2075, courts cannot resort to rules, such as Rule 2018(a), to define the scope of statutory provisions, such as § 1109(b)).
 
 
 [26]
 Fed.R.Civ.P. 24(a)(1) provides that upon timely application, "anyone shall be permitted to intervene in an action . . . when a statute of the United States confers an unconditional right to intervene."
 
 
 [27]
 The bankruptcy court also relied in part on 11 U.S.C. § 1103(c)(5), which provides that a creditors' committee may "perform such . . . services as are in the interest of those represented." This court has previously recognized that § 1103(c)(5) provides a statutory basis for granting derivative standing in some casesSee STN, 779 F.2d at 904 (citing §§ 1103(c)(5) and 1109(b) as implying qualified right to derivative standing for creditors); see also 7 Collier ¶ 1103.05[6][a] (arguing that § 1103(c)(5) supports derivative standing where the debtor-in-possession has unjustifiably failed to act). Our consideration of § 1103(c)(5) as a potential basis for appellees' standing is thus subsumed by our discussion of derivative standing, supra.